Your Honor, Robert Hanna, for appellant, and I'll call him Luis Rodriguez Ortega, which is how he described himself, and he's known in the case as Miguel Valedon. And I'll just point out that that was part one of the issues of sentencing about the district court I'm not going to talk about. The sort of the nuts and bolts issue here is that there was a procedural error by the district court in applying the 18-level enhancement. They did half the calculation, okay? The district court started out with the intended loss, okay? What it did not do and what it was required to do was attribute that portion of the intended loss to Mr. Ortega. Alito Okay. But, Mr. Hanna, before we get to that, I want you to help clarify the standard of review on this issue, because on page 9 of your brief, where you set forth the objection. Hanna Yes. Alito And then you say, you don't ever discuss it, you just say, although Mr. Ortega has not forfeited his right to raise this issue, he would prevail even if it was on plain error. But I don't see how that objection preserves anything. That objection is just simply reiterating his view. You weren't the trial lawyer, as I recall. Hanna No, I was not. Alito Just reiterating defense counsel's view that, gee, judge, you ought to follow the agreement of the parties. But where does the objection, it doesn't discuss its improper to use intended loss. All it says is, you know, we want you to follow what the government and I agreed on, and the judge wasn't obligated to do that. So I don't see whether there's a proper objection. Well, I will get to the second part of the question. But beginning at line 4 of page 17, he says, both the government in analysis of this case, and then the key languages, and the involvement of my client as part of the plea agreement, and then he says agreed. Yes, but that just means that the government and the defense lawyer agreed. But the judge wasn't bound by that agreement. And the government looked at the client's involvement. I would make a brief comment that that would have been accurate, except at the bottom of page 21, the government came in and said, we can't essentially, we cannot prove that he is responsible for every dollar of the intended loss. The government begins with the statement, this was a negotiated plea agreement, and then it says, taking into account the entirety of defendant's criminal conduct. So not only do we have Mr. Ortega making this objection, and granted it is not as elegantly phrased, and we argue that it doesn't have to be elegantly phrased, but the government concedes that the amount in the plea agreement is a proxy, the amount of actual loss is a proxy for what they can prove, and if you look at paragraph 20, which is the key paragraph of the pre-sentence report, because the pre-sentence report elsewhere says there were over a thousand returns. Okay? And then it links about, by my count, three dozen boxes, and then in paragraph 20 what it says is, Mr. Ortega and five other individuals traveled from Los Angeles, California to Chicago to rent 126 boxes. In other words, all five of them went and rented 126 boxes for the purpose of receiving these returns. And so not only do we have a government concession, not only, I think, granted not elegantly stated, we do have an objection, okay, but we also have the pre-sentence report that to the more than 1,000 returns in all of the conspiracy, and in fact, it may be as little as 8 percent based on the averages of the return and the total amount of the intended loss. We don't know. The pre-sentence report, the government doesn't set it forth. And even if that were so, it's plain error not to do the second step of the analysis. Well, let's back up. When the government said they couldn't prove it, they might have been referring to their burden of proof at trial beyond a reasonable doubt, but relevant conduct under 1B1.3a only has to be proven by preponderance of the evidence. Yes, I will say that is so based on circuit precedent, and I would agree with that. And paragraph 34 of the pre-sentence report refers to relevant conduct. Yes, it does. But the judge did not make a specific finding that the intended loss was reasonably foreseeable and part of jointly undertaken criminal activity. Yes. And I want to go back ultimately, because this all referred to. Well, here's my final question, and then I'll let you answer. Isn't the real question on this issue whether one can infer that the judge put two and two together, the various paragraphs we've talked about? And without specifically articulating it, made a finding that this was relevant conduct and it was reasonably foreseeable? I mean, after all, your client did go to Illinois, did open up all these boxes, did go with five other co-conspirators. Isn't it reasonably foreseeable that they would have opened up other boxes? It is reasonably foreseeable that there might have been some more than 126, say 150. We don't know, but it's a leap to get from, and I think I counted 168. In other words, from 168 to more than 1,000 and potentially close to 2,000, depending on. So, and I'll also add that when you refer to relevant conduct generally, paragraph 34 is, okay, just a general generic description of the relevant conduct guideline, which is also, by the way, repeated in the fleet agreement at page 127 specifically. So we've got that issue. But the only logical purpose of having it in paragraph 34 is to tie it to paragraph 38, where you find the total amount of intended loss. Otherwise, it wouldn't make any sense to have any discussion of relevant conduct in the pre-sentence report. Well, but you still have to, in the pre-sentence report, say the relevant conduct includes all of the intended loss, and that is not there, okay? We have a discussion of what Mr. Ortega was involved in, okay? What the pre-sentence report could document. We have a statement of the rule for intended loss. And then we have a statement of the total intended loss. But the missing link is that there's no statement that says we can infer Mr. Ortega reasonably foresaw, and we would, by the way, contend that that was removed from relevant conduct by agreement, as we've argued in the reply. But in any case. Well, that agreement wasn't binding on the judge, though. You keep overlooking that. That's the second issue, okay, is that ultimately you have unreliable information to wit no information. That's number one. And I would agree with you if I was arguing this before noon on March 21st, 2012. I would completely agree with the Court. However, it's later than that. And ultimately I think we've gone into another argument, and it is raised in reply because it didn't exist until after the opening brief happened to be filed. I go through that argument that when the Supreme Court says, oh, we've got a plea and sentencing system, and the backstop of trials is not enough, that changes things. And I will ‑‑ I readily understand that that's nothing that anybody has yet talked about, but those cases are coming. But at the end of the day, there's nothing for the Court to disagree about, because ultimately the Court concluded, ultimately the Court concluded he has a middle-level manager's role. He wasn't involved in the whole thing. He wasn't high up. Okay. That's how the Court ultimately described his role. And I want to spend a few more remarks just on the Pepper argument. And again, that's an issue of ‑‑ that issue arose to some ‑‑ arose after Mr. Ortega was sentenced. My comment on that argument is that Pepper is very broad. The district court is free to disagree with guidelines. And if it's free to out now disagree with guidelines, certainly you can take an intermediate position and say, we need to pay attention to the interaction between the sophisticated means, which focuses on the scheme, and whether Mr. Ortega was involved in the, if you will, the creative end of the business. And certainly this Court would then have a common law supervisory role in sort of fashioning common law. Mr. Hannon, you know who the trial judge was in Pepper that got affirmed? You know, I don't know. Well, you're looking at him. I don't read Pepper anywhere near the way you do, with all due respect. Well, I understand. And I was reversed either two or three times by the Eighth Circuit in Pepper before it went to the Supreme Court. So it paid a lot of attention to it. But it's ‑‑ I don't see its application in this case. Well ‑‑ And you cite Spears, too. I was a trial court judge in Spears, too. Same thing, got reversed multiple times by the Court of Appeals, goes to the Supreme Court. But Pepper and Spears have to do with policy disagreements with the ‑‑ well, Spears is a policy disagreement with the guidelines. Pepper is post defense rehabilitation. And it really doesn't ‑‑ neither one have anything to do with this case. Well, I mean, I would just tell the Court that it's not just been applied to those specific facts. And you don't have to have an out‑and‑out agreement. You can disagree with either a ‑‑ the lesser thing to do under Pepper is to disagree with a particular application or something that should be considered with all of these guidelines that are not necessarily addressed. In other words, I'm arguing it's a little more flexible than black or white disagree or not disagree. And I think there is ‑‑ But there's nothing in either case that requires the judge to disagree. So it seems to me you're trying to foist on the district court your disagreement and impose that on the district court. But neither Pepper, Spears, Kimbrough, any of those cases require the district court judge to disagree. What it requires to do and what we would argue was not done was an exercise of consideration. And the last issue I'm going to touch on real briefly is the immigration consequences. We think a broad reading, as suggested by Miller v. Gammie, now puts the final knife in the collateral direct circumstances. And that immigration advisement was misleading. Your Honor, we've asked for the sentence to be vacated. And we've asked for, in fact, the conviction to be set aside on the plea grounds. And that's all I have. Didn't the judge give some immigration advice? Yes, he did. And I can quote it. And you'll see, given the circumstances, Your Honor, how misleading. The court says if you are not a citizen, your conviction could result in possible deportation. This is a fraud. And it is very likely that in an immigration proceeding, the government could prove by clear and convincing evidence that he was involved in more than $10,000. And at that point, you have to, I think, to be honest, say deportation is probable. And that is an advisement that can lull a defendant to sleep. And he was represented at the time? Yes, he was represented.  Basically, his attorney's obligation to advise him of the possible immigration. Yes, it is. And if you think about it that way, yes, it is his attorney's advisement. But it's also the duty of the court to make sure that the defendant understands the consequences of what he's doing. And that's the whole collateral direct issue that Padilla kicked one leg away from it. And now that we know that we resolve 95 percent cases by plea, and a trial is not an adequate constitutional backstop for protection, then a material Even before Frye, there was one state court that said, at a certain point, the quote-unquote collateral consequence is just so daunting that that you should advise. Is so what? Daunting. In other words. Oh, daunting. Yes. The state courts, the case that I cite out of New Jersey, for example, I think was a residency restriction or something, or it was commitment. It was civil commitment. And that was the dominant consequence in the case for a sex offense. Okay. Thank you. May it please the Court. Alka Sager for the United States. Your Honors, the district court did not commit any procedural error in determining the defendant in this case. Thank you. Could you speak up a little? I'm sorry. The district court did not commit any procedural error in sentencing the defendant and in finding that the intended loss figure was the figure to be used in calculating the guidelines. Notwithstanding the fact that the parties had a plea agreement in which they agreed that they would jointly recommend to the court that it use the actual loss figure, the district court was entitled, because this was not a binding plea agreement and the defendant acknowledged that at sentencing, to make a different finding. It's difficult for a defendant to claim that the intended loss figure was incorrect because or that he was not somehow responsible for the total amount of intended loss, because in the plea agreements. What would have happened to the guideline sentencing range if the judge had used the recommended loss that the two parties agreed on? Because he was sentenced to 57 months at the low end of the guideline range as the district judge calculated that range. What would have happened to the range? The guideline range would have been four levels lower. It would have brought him down from a level 23 to a level 19. And what range of sentencing does that produce? So at a level 19, which would have included the two points for sophisticated means, the range was 37 to 46 months. So this would have been, the sentence then would have been outside that range. That's right. In the plea agreement, the defendant agreed that he was involved in a scheme with others to file false tax returns by opening mailboxes using false identifications. The actual loss that the IRS sustained in issuing these fraudulent refund checks and having those checks cashed was about $780,000, and the defendant agreed to that amount. It strains credibility for the defendant to now claim that the intended loss, which is just the sum total of the tax refunds claimed on all of the tax returns that were filed as part of the scheme, that somehow he wasn't responsible for that. Because the intended loss calculation is just a mathematical formula. It's just adding up all of the claimed tax returns. Really? I mean, he's not at the high, in the high echelons of the scheme. That's correct. So there's no showing that he actually knew how widespread the scheme was. But the district court could have found, based on the information that was available to it, to which the defendant did not contest. The defendant didn't contest any of these findings at sentencing, nor did he claim that he was not responsible for the $5.4 million intended loss or that he was responsible for a figure that was less than $5.4 million. But there was enough evidence in the record for the district court to find that, based on the acts that defendant did commit, which is opening up these mailboxes, traveling with five others to Chicago to open up a total of 126 boxes over a period of 7 days, with reference to the items that were found during a search of defendant's residence, which included birth certificates of people who were born in Puerto Rico, identity theft victims, residents of Puerto Rico, lists of mailbox addresses, mailbox keys. The district court was entitled to find from that evidence, which was in the presentence report, that the defendant was engaged in jointly undertaken criminal activity with others, and that he was responsible for the acts of those others taken in furtherance of that jointly undertaken criminal activity that were reasonably foreseeable to him. But the district court judge actually never made that specific finding. I think, isn't your argument you can infer it from the paragraphs of the presentence report? Correct. And the reason the district court didn't make that finding is because the defendant didn't make any objections. Thus triggering Rule 32. Exactly. And had the defendant made an objection, then the government could have presented evidence linking defendant's knowledge of the total amount of returns that was filed in the scheme, and the defendant could have challenged those findings. He could have claimed he wasn't responsible for mailboxes opened in a certain area, for example. But he never gave the district court that opportunity because he didn't contest the figure. But did the government object for the defendant when the government said we couldn't prove the intended loss? Well, I think counsel is mistaken in arguing that the government somehow conceded that it couldn't prove the intended loss. As I said earlier, the intended loss was just a mathematical addition of all of the And as the presentence report notes in a footnote on page 7, there were $1.7 million in refunds that were claimed from the tax returns that were filed in the Chicago, Illinois area, and $3.7 million in refunds claimed from the tax returns that were filed in Southern California. And that's where we come up with the $5.4 million figure. The government was simply arguing to the district court that as part of a negotiated plea agreement, taking into account the fact that this defendant was not the orchestrator, not the organizer of the scheme, that the government believed that sentencing should proceed on actual loss, and the actual loss was $780,000. But the plea agreement was not binding on the court. The defendant knew that at the time he entered his guilty plea, and defense counsel agreed that it was not binding at the time of sentencing. And the district court was entitled to reject that loss calculation. The defendant did receive the benefit of his plea bargain in this case. He received the benefit of the government standing up at sentencing and arguing for a lower loss figure than it could have asked for. But the district court was entitled to reject that. In terms of the argument as to whether or not the defendant was properly advised about his deportation rights, I would just point out that this Court's decision in Delgado-Ramos forecloses the argument that the defendant makes. Missouri v. Fry and Lafleur v. Cooper are Sixth Amendment cases. This Court has never held that it is incumbent upon the district court to advise a criminal defendant of immigration consequences, because those consequences are collateral. They come about as a result of a decision by another court over which the district court that sentences the defendant has no control. If the court does not have any further questions, the government would submit. So whose obligation, then, is it to make the advisement? Well, the Supreme Court has held that it is defense counsel's obligation to advise the defendant of the immigration consequences of his decision to enter a guilty plea. And to embed advisement where those consequences are crystal clear must be that you will be deported, and where those consequences are somewhat unclear, defense counsel at a minimum must advise the defendant that that is a possible consequence. But no court has held that the district court must somehow look into the defendant's particular circumstances and the immigration laws that apply to the defendant's And in this case, the district court informed the defendant that one of the consequences of pleading guilty could be that he would be deported if he wasn't a U.S. citizen. The plea agreement also advised the defendant of that fact. And as the government points out in its brief, the defendant had a 2009 fraud conviction in which he was also advised through the plea agreement that he could be deported. So irrespective of what happened in this case, even if for some reason this criminal conviction wouldn't automatically result in the defendant's deportation, he had a prior conviction. And he was also, by virtue of at the change of plea, admitting that his name was some other name than the name that he had claimed to be, admitting that he did not, that he wasn't born in Puerto Rico as he claimed, the defendant was an illegal alien. He didn't have a status here. So he would have been subject to deportation regardless of his criminal convictions. Thank you, Your Honor. Where is that other conviction referred to in the probation report? The intended loss amounts, Your Honor? Yeah. So that is in the pre-sentence report at page 7, and it's footnote 2 at the bottom. And it states that claims to the IRS associated with the Chicago, Illinois area totaled approximately 1.7 million, and claims to the IRS associated with California totaled 3,728,000. Where on the record do we have reference to the earlier conviction to which you referred? So at the government's, I'm sorry, the defendant's excerpt of record at page 48 is the plea agreement that the defendant signed in case number 08-914. This plea agreement was filed on February 9th, and paragraph 8 of that plea agreement, and that's at the excerpt at page 50, advises the defendant that the conviction in this case may subject him to collateral consequences, including deportation. That's the earlier conviction? That's the earlier plea agreement, yes. And that conviction was for what? That conviction was for filing false loan applications to banks in support of mortgage loans. The defendant claimed that his income was $10,000 to $11,000 per month, and he claimed to be employed at a company that he was not employed at, and he didn't have the income. And there were two counts. Ms. Tegerer, I wanted to just verify something, make sure I understand this correctly. I have the transcript of the sentencing in front of me, and I've read it a couple of times, and so I'm familiar with the objection that the defendant made to the intended loss, or didn't make, in my view, probably, but what the defense is arguing. There was an objection, though, after the pre-sentence report was issued by the defendant, but that objection was on different grounds than what they were raising in this appeal. Isn't that right? Their objection was just, well, you ought to go with the plea agreement. That's correct. Yeah. So they've never raised the relevant conduct issue. That's never been raised before the district court. That's correct. And it's the government's position, because they've never contested the defendant's responsibility for the amount of intended loss, that this Court's review is for plain error. Thank you. Thank you. Thank you, Your Honor. I think we need, the government has the burden of proof on the second of what I will call the federal elements. They have the responsibility to come in and make the allocation, and footnote 2 does not do it. All it talks about is an allocation of total amounts of money between Chicago and California, and it never talks about whether the 126 boxes were all there was in Chicago, part, how much the defendant knew about it, and so on. Okay. The second thing is that the Fifth and Sixth, I'll be brief. The Fifth and Sixth Amendments were proposed to gather their weight. I think if you take a look at the Scalia argument, or the Scalia article that I've cited, and which the en banc court did, the general idea there is to read Supreme Court precedents broadly, and finally, on the immigration, the choice is not, the choice is not to add to his immigration consequences. Concededly, he may have other immigration problems, but you do not want to make a plea and add to the problems you already have, and that's the issue. And with that, unless the Court has questions. I do have a question about footnote 2. Yes. Yes. Footnote 2 would have to be proved if there was a proper objection to it. But in the absence, was there ever an objection to footnote 2? There was not an objection to footnote 2, but footnote 2 doesn't allocate any particular portion to the defendant. All it talks about is the total intended loss. Total intended loss associated with activity in Chicago and associated in California, and it never presents information that links Mr. Ortega to all that are part of it. Right. And your objection actually isn't to the total loss. It's to the failure of the district court to allocate it. That's right. We did not object to the total intended loss. We said that you should use the proxy for his share that the government submitted. That's correct. Thank you for clarifying that. All right. Thank you. The matter is submitted.
judges: Bennett, Pregerson, Fletcher